432 B.R. 354 (2010)
In re ERVING INDUSTRIES, INC., et al., Debtors.
No. 09-30623.
United States Bankruptcy Court, D. Massachusetts, Western Division.
April 7, 2010.
*356 George I. Roumeliotis, Henry E. Geberth, Jr., Hendel & Collins, P.C., Springfield, MA, for Debtors.

MEMORANDUM OF DECISION
HENRY J. BOROFF, Bankruptcy Judge.
This case presents an issue of first impression in the First Circuit: whether a creditor's supply of electricity to a debtor within the 20 days preceding the commencement of a bankruptcy case constitutes a sale of goods, entitling the creditor to a priority administrative expense claim under § 503(b)(9) of the United States Bankruptcy Code.[1]

I. FACTS AND TRAVEL OF THE CASE

Erving Industries, Inc., debtor and debtor-in-possession, together with certain of its affiliates,[2] (collectively the "Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on April 20, 2009 (the "Petition Date"). On July 2, 2009, at the request of the Debtor, the Court entered an order setting August 7, 2009 as the deadline for creditors to file priority administrative claims under § 503(b)(9) with respect to goods delivered to the Debtor within the 20-day period preceding the Petition Date. Constellation NewEnergy, Inc. ("NewEnergy") timely submitted such a claim in the amount of $281,667.88 (the "Claim").
On September 16, 2009, the Debtor filed an objection to NewEnergy's Claim (the "Objection"), to which NewEnergy responded (the "Response").[3] The Debtor and NewEnergy agree that the amount claimed by NewEnergy accurately represents charges for electricity supplied to the Debtor during the relevant time period. But the Debtor objects to the priority asserted for the Claim under § 503(b)(9) *357 on grounds that electricity is not a good covered by the relevant section of the Bankruptcy Code. This is the only issue to be decided.[4] If the Court concludes that electricity is a good within the meaning of § 503(b)(9), then NewEnergy is entitled to a priority administrative claim of $281,667.88 in the Debtor's Chapter 11 case; if the Court concludes that electricity is not a good, then NewEnergy is left with a general unsecured claim against the Debtor.

II. POSITIONS OF THE PARTIES

A. Service or Sale
Section 503(b)(9) provides a priority claim for the value of goods sold to a debtor in the ordinary course of the debtor's business within the 20 days preceding the commencement date of the bankruptcy case. 11 U.S.C. § 503(b)(9). Although courts have divided on certain questions arising under § 503(b)(9), there is no doubt that § 503(b)(9) does not cover creditor claims arising from the provision of services to a debtor.

1. Debtor

The Debtor would have the Court hold that, regardless of the definition of goods under § 503(b)(9), NewEnergy's Claim is not entitled to priority status because NewEnergy provided a service. Relying on a description of the electric industry provided by the Massachusetts Executive Office of Energy and Environmental Affairs, the Debtor argues that the industry is composed entirely of service providers, which categorization includes NewEnergy.
Should the Court conclude that the definition of goods under Article 2 of the Uniform Commercial Code (the "UCC" or "Article 2") is applicable here, the Debtor further maintains that the Court should apply the "predominant factor test" to determine that the transactions between NewEnergy and the Debtor relate primarily to the rendering of services. The Debtor analogizes this case to Mattoon v. City of Pittsfield, 56 Mass.App.Ct. 124, 775 N.E.2d 770 (2002), in which the Appeals Court of Massachusetts held that the supply of water was predominantly the provision of a service and not the sale of goods. According to the Debtor, "if water . . . is predominantly a `service,' then it is difficult to argue that electricity is anything other than a `service.'" Debtor's Obj. at 9.
In further support of its claim that New-Energy provided a service, the Debtor characterizes NewEnergy as a "utility provider." And pointing to the description of utility providers in both Black's Law Dictionary and in § 366 of the Bankruptcy Code, the Debtor emphasizes that utilities are described by both as providing services.
Arguing in support of the Debtor at the January 12, 2010 non-evidentiary hearing on the Objection (the "Hearing"), counsel for the Official Creditor's Committee ("Committee Counsel") noted that the contract between the Debtor and NewEnergy *358 (the "Agreement")[5] refers in several places to service or services. According to Committee Counsel, this supports the Debtor's contention that the Agreement was understood by both the Debtor and NewEnergy to be a services contract and not a contract for the sale of goods.

2. NewEnergy

NewEnergy maintains that the Debtor's characterization ignores the fact that NewEnergy does not perform the traditional service functions commonly associated with electric utilities. Describing the current partially deregulated electric industry in Massachusetts, NewEnergy differentiates between the delivery of electricity as a service and the sale of electricity as the sale of goods. While regulated utilities are still responsible for the ultimate delivery of electricity to customers, NewEnergy says it has no role in that delivery and is involved solely in the sale of electricity as a "competitive supplier." NewEnergy notes that the Debtor's arguments are ironically negated by its own practices, i.e., the Debtor pays separately to the local electric utility for delivery of electricity, and NewEnergy's invoices reflect only the charges for the electricity itself.
NewEnergy also disputes the Debtor's characterization of NewEnergy as a "utility provider." First directing the Court's attention to a "Chart of Massachusetts Electric Utility Providers" maintained by the Commonwealth, NewEnergy notes that it is not listed as an electric utility. In addition, NewEnergy maintains that its activities in relation to the Debtor do not fit within the traditional concept of a providing utilities, as assumed by Black's Law Dictionary and as used in § 366 of the Code, because it does not have a monopoly or exclusive service or franchise area, is not regulated by the government, and is subject to competition from a number of available alternative sources of electricity.
According to NewEnergy, the Agreement supports this analysis. While NewEnergy concedes that the Agreement contains an occasional reference to service, it notes that the Agreement also provides that NewEnergy is not responsible for, and in fact expressly disclaims responsibility for, the transmission and distribution of electricity to the Debtor's location; delivery responsibilities remain in the hands of the regulated local utility.
Finally, NewEnergy contends that the "predominant factor test" has no applicability under § 503(b)(9), because the test applies only in those limited circumstances when a court must characterize an entire transaction or set of transactions as either predominantly the sale of goods or the provision of services. Section 503(b)(9), says NewEnergy, does not require the claimant to demonstrate that, on the whole, its transactions with a debtor were predominantly for the sale of goods. Rather, § 503(b)(9) creates a priority claim for the value of any goods sold to a debtor in the ordinary course of business within the 20 days preceding the bankruptcy filing, even if that sale were part of a larger, predominantly service-oriented transaction. Thus, NewEnergy concludes, the predominant factor test is irrelevant, and the Court should examine only whether the electricity sold to the Debtor by NewEnergy constitutes a sale of goods, entitling NewEnergy to a priority claim under § 503(b)(9).

B. The Definition ofGoods under § 503(b)(9) and its Application to Electricity
In the event the Court declines to hold that NewEnergy was merely providing a *359 service, both parties recognize that Court must determine the meaning of goods under § 503(b)(9), since the term goods is not defined in the Bankruptcy Code

1. The Debtor

Relying on the fact that the Bankruptcy Code is a federal statute, the Debtor contends that the Court should not rely on the UCC definition of goods, as application of the UCC to § 503(b)(9) would require reference to disparate state laws, yielding undesired non-uniformity of interpretation. Instead, the Debtor says goods under § 503(b)(9) should be defined with reference to the "ordinary or natural" meaning of the word. Arguing for the Black's Law Dictionary definition of goods as "tangible or movable personal property," Black's Law Dictionary 762 (9th ed.2009), the Debtor distills the question to whether electricity constitutes "tangible personal property," urging the Court to adopt a meaning of goods as "anything that could be packaged, shipped, and dropped off at a customer's loading bay." Hr'g Tr. 4:7-15 (Jan. 12, 2010).
The Debtor contends that electricity is simply not a good because it is an intangible phenomena, the movement of electrical charges, and is devoid of physical form or attributes. The Debtor asks this Court to adopt the analysis of the court in In re Pilgrim's Pride Corp., 421 B.R. 231 (Bankr.N.D.Tex.2009), where the court concluded that electricity is not a good under § 503(b)(9). There, the bankruptcy court applied the UCC definition of goods and held that the provision of electricity was more akin to the transmission of television programming, which is widely held to constitute a service (the distribution of intellectual property) and not the sale of goods under the UCC.
Furthermore, the Debtor maintains that electricity cannot be considered a good under Article 2 of the UCC, because it is not movable at the time it is identified to the contract between the Debtor and NewEnergy, as required under the UCC definition of goods. Drawing upon the analysis of the Pilgrim's Pride court, the Debtor argues that by the time the electricity subject to the Agreement is "identified," i.e., measured by the electric meter, it is consumed and no longer movable. Thus, it can not be a good under Article 2 of the UCC.

2. NewEnergy

NewEnergy recommends that this Court join the majority of courts and conclude that the goods under § 503(b)(9) should be interpreted in accord with the definition of that term found in § 2-105 of the UCC. NewEnergy contends that the UCC definition is not only widely-used and accepted by both state and federal courts, but is also consistent with the ordinary, non-legal understanding of the term.
Looking to the UCC definition of goodsthings that are movable at the time they are identified to the contract for saleNewEnergy insists that electricity is a good. First, NewEnergy says, electricity is literally movable; it moves from the location where it is generated, through the transmission and distribution systems, and ultimately arrives at the customer's location. And electricity is clearly identifiable, because it is measured by the meter upon delivery. Finally, NewEnergy contends that the electricity is not only movable and identifiable, but is movable at the time it is identified to the contract, since it is moving through the electric meter at the time it is measured and identified to the contract between the Debtor and NewEnergy.
But even if this Court were to reject the UCC definition of goods, and focus instead on the Debtor's "tangibility" requirement, NewEnergy argues that electricity is tangiblea tangibility made obvious from *360 the physical (and often fatal) result obtained by touching a wire transmitting electricity. According to NewEnergy, because it can be "perceived by touch," electricity is physical, tangible property and constitutes goods not only under Article 2 of the UCC, but also under the Debtor's proposed meaning of goods under § 503(b)(9).

C. Relationship to § 546(c)

1. The Debtor

The Debtor rejects NewEnergy's interpretation of the term goods under § 503(b)(9) as too broad. The Debtor says that the term goods as used in § 503(b)(9) encompasses a limited category of things subject to reclamation under § 546(c) of the Bankruptcy Code. According to the Debtor, Congress intended § 503(b)(9) to provide an alternative remedy for creditors who would be entitled to reclamation under § 546(c) but for their inability to meet the rigorous noticing standards under that section. Since § 546(c)(2) specifically provides that creditors unable to reclaim goods under that section may nonetheless be entitled to a priority claim under § 503(b)(9), the Debtor maintains the two sections were intended to "work in tandem." The Debtor says the legislative history supports this interpretation, as both the addition of § 503(b)(9) and the revision of § 546(c) were included under the heading "Reclamation" in the public law enacting the 2005 changes to the Code.
The Debtor describes the purpose behind both § 546(c) and § 503(b)(9) as an effort by Congress to prevent debtors from "stockpiling" goods or, at the very least, providing a priority claim for stockpiled goods when creditors are unable to reclaim them. Therefore, the Debtor would conclude that the goods referenced in both § 546(c) and § 503(b)(9) "must have been capable of repossession," Debtor's Reply Memo., at 3-4, and since the Debtor also contends that electricity cannot be either "stockpiled" or reclaimed, classifying electricity as a good under § 503(b)(9) is inconsistent with congressional intent.

2. NewEnergy

NewEnergy disagrees with the Debtor's use of legislative history to interpret the meaning of goods under § 503(b)(9). While acknowledging that Congress may have intended to create a priority claim as an alternative available to creditors who are technically unable to reclaim goods under § 546(c), NewEnergy says that nothing in § 503(b)(9) limits priority status for other creditors. In fact, says NewEnergy, other creditors providing goods that are, for practical purposes, unable to be reclaimed (such as raw materials, natural gas, and water) are nonetheless held to have sold goods within the meaning of § 503(b)(9) and have successfully asserted priority claims on that basis.

D. "Narrow" Interpretation of Priority Statutes
Relying on the Supreme Court of the United States's discussion in Howard Delivery Service v. Zurich American Insurance Co., where the Court held that the objective of equal distribution under the Bankruptcy Code militated against broadly interpreting a priority provision to cover a claim not clearly falling within the statute's terms, see 547 U.S. 651, 667-68, 126 S.Ct. 2105, 165 L.Ed.2d 110 (2006), the Debtor urges the Court to similarly "narrowly interpret" § 503(b)(9) and to reject a "broad" interpretation that would include electricity as goods. NewEnergy, in contrast, maintains that electricity clearly falls within the definition of goods under § 503(b)(9) and, therefore, does not present the type of "close call" which would require the application of the interpretive principles enunciated in Zurich.

*361 III. DISCUSSION

Section 503(b)(9), added to the Bankruptcy Code in 2005,[6] creates a priority administrative expense claim for the value of goods received by a debtor in the ordinary course of business during the 20 days prior to the bankruptcy filing.[7] 11 U.S.C. § 503(b)(9). "Resolving the meaning of section 503(b)(9) begins with the language of the statute itself." In re Goody's Family Clothing, Inc., 401 B.R. 131, 133-34 (Bankr.D.Del.2009) (citing U.S. v. Ron Pair Enters., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). It is well-settled that § 503(b)(9) does not provide priority status to claims for services rendered[8]the statute refers only to "the value of . . . goods." 11 U.S.C. § 503(b)(9) (emphasis supplied).

A. Services Contract or Contract for Sales?
Regardless of which definition of goods governs the meaning of the term in § 503(b)(9), the Debtor contends that NewEnergy's Claim is not entitled to priority status because NewEnergy did not sell anything, but merely provided a service. Determining whether NewEnergy provided a service requires a brief examination of NewEnergy's role in the electric industry[9] and the terms of the Agreement between parties.[10]
"In the electric industry as it existed before restructuring, [generation, transmission, distribution, and customer services] were bundled and provided as monopoly services by electric companies, at prices fully regulated by the Department [of Public Utilities]." Mass EOEEA. But today, customers "are [] able to purchase generation services from entities other than their traditional electric companies," and the prices charged by those "competitive suppliers" are "not [] regulated by the Department." Id. Transmission, distribution, and customer services, however, "have not been opened to competition" and *362 "continue to be provided as monopoly services by the electric companies." Id. Customers' electricity bills are itemized and separated into distribution, transmission, energy use, and other charges; customers who purchase electricity from a competitive supplier may request separate billings from the electricity supplier and the local utility company. Id.
Electricity from generation facilities (i.e., "power plants") reaches a customer's location through a series of transmission and distribution lines.[11] The generators are connected to a network of high-voltage transmission lines used for transmitting electricity over long distances (the "transmission grid").[12]Restructuring Primer, at 4.1. Before entering a local utility's distribution lines, the electricity is typically passed through a substation where it is "stepped down" to a lower voltage. Id. The local utility then distributes the electricity through its lower-voltage distribution system, using transformers to lower the voltage again as the electricity comes off the distribution line and passes into the customer's home or business. Id.
NewEnergy acts as a "competitive supplier" within this framework. NewEnergy contracts with electricity generators to buy electricity. Under NewEnergy's contracts with its customers, it sells that electricity to the customer, ensuring that an adequate supply of electricity is delivered from the generating facility to the transmission grid. The customer is then responsible for contracting with the local utility to have the electricity delivered from the transmission grid to the customer's location.
Relying on the Mass EOEEA's description of the restructured electric industry, see, supra n. 9, the Debtor says that New-Energy's role in the electric industry is one of a service provider. The Mass EOEEA does describe the electric industry in terms of services"generation service"; "transmission service"; "distribution service"; and "customer service." See Mass EOEEA. But the Debtor's conclusion that the whole of the electric industry is thus comprised only of service providers takes the Mass EOEEA's description out of context and places undue emphasis on its terminology.
Regardless of the Mass EOEEA's general description of the electric industry as one involving various services, that description is apt only to the extent that it actually describes the nature of NewEnergy's transactions with the Debtor. The Mass EOEEA's discussion is intended to educate the general public and to help customers better understand electric industry deregulation in Massachusetts. It does not purport to reach any conclusive legal characterizations relevant to the industry. Thus, to the extent that it describes activities as services as opposed to sales it is not, standing alone, particularly persuasive.
While the Mass EOEEA indicates that some entities provide "generation services," NewEnergy does not independently generate electricity. It resells electricity it purchases from others. And even if the Mass EOEEA would include NewEnergy's *363 activities under the category of "generation services," the Court would not thereby conclude that NewEnergy provides a service. Entities who "generate" things are not service providers merely because they engage in the act of generation. A farmer may be said to "generate" crops by sowing seeds, watering, weeding, and harvesting. But when the farmer takes the fruits of her labors to market, we do not say that she provides a service in the legal sense because she "generates" food. We say she sells food. Similarly, here, the Mass EOEEA may say that certain entities provide "generating services" because they generate electricity, but this is not the whole of the story. Ultimately, the electricity that is generated is sold. Whether or not electricity is a good, NewEnergy is in the business of selling that electricity, and not providing a service. See Ransome v. Wisc. Elec. Power Co., 87 Wis.2d 605, 275 N.W.2d 641, 643, 648 (Wisc.1979) ("The distribution [of electricity] might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product.").[13]
But the Debtors also say that NewEnergy must have provided a service because NewEnergy is a utility and, Black's Law Dictionary and § 366 of the Code tell us, utilities provide services.[14] NewEnergy, however, says that it is not a utility in the traditional sense, and the Court agrees. Utility is not defined in the Bankruptcy Code, but the term ordinarily refers to a "business organization (as an electric company) performing a public service and subject to special governmental regulations," that has "some special position with respect to the debtor," and has "a monopoly in the area so that the debtor cannot easily obtain comparable service from another." One Stop Realtour Place, Inc. v. Allegiance Telecom, Inc. (In re One Stop Realtour Place, Inc.), 268 B.R. 430, 435, 436, 437 (Bankr.E.D.Pa.2001); see also Darby v. Time Warner Cable, Inc. (In re Darby), 470 F.3d 573, 575 (5th Cir.2006).
NewEnergy is not subject to governmental regulation as are traditional utilities *364 and the local utilities that continue to provide transmission, distribution, maintenance, and customer services in Massachusetts. See Mass EOEEA. And NewEnergy does not enjoy a "special relationship with the Debtor," because alternative sources of electricity are available to the Debtor; the Debtor could choose to obtain its electricity from the local electric utility company or from a variety of other competitive suppliers. See, Darby, 470 F.3d at 575 (where debtor could obtain alternative cable service with minimal inconvenience, cable company was not "utility" within the meaning of § 366). Most telling, perhaps, is the fact that the Mass EOEEA does not list NewEnergy among those entities classified as "utilities" in the Commonwealth. See "Massachusetts Public Utility Service Providers (Electricity)," reproduced at Appendix 4 and available at (last visited April 7, 2010).[15]
The conclusion that NewEnergy was not providing services to the Debtor is further supported by the terms of their Agreement. The Agreement's very titleMaster Electricity Supply Agreementindicates that it is a contract governing the sale of electricity and not the provision of a service. The Agreement consistently refers to the Debtor's "purchase" and New-Energy's "sale" of electricity.[16] And where the Agreement speaks of service or services,[17] the usage is loose. When read in context, the references to service(s) in the Agreement are generic, in much the same way as the Mass EOEEA generically refers to generation services when actually speaking of both the generation and sale of electricity.[18]
For all of these reasons, the Court concludes that NewEnergy's Claim does not arise from services provided to the Debtor, but solely from the sale of electricity. The only question remaining is whether that electricity constitutes a good under § 503(b)(9).

B. Defining Goods under § 503(b)(9)
The term goods is not defined in the Bankruptcy Code, and the Court must *365 first determine what framework should be applied for assessing whether a thing is or is not a good under § 503(b)(9). The Debtor urges the Court to adopt a "common" understanding of the term, directing the Court's attention to the definition of goods contained in Black's Law Dictionary"tangible or movable personal property." Black's Law Dictionary 762 (9th ed.2009). While "[i]n the absence of either a built-in definition or some reliable indicum that the drafters intended a special nuance, accepted canons of construction teach that the word should be given its ordinary meaning," which definition may include its "accepted dictionary definition,"[19] it is also a "`well established' principle that `[w]here Congress uses terms that have accumulated settled meaning under. . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'"[20] This is especially true in the context of the Bankruptcy Code. See Goody's, 401 B.R. at 134 ("When Congress amends the bankruptcy laws, it does not write `on a clean slate.'") (quoting Dewsnup, 502 U.S. at 419, 112 S.Ct. 773).
Given the wide usage and acceptance of the definition of goods found in the UCC at § 2-105(1), it is hardly plausible that Congress expected bankruptcy judges to roll up their sleeves and set to work re-inventing the proverbial wheel and divining a more amorphous "common understanding" of the term. Instead, this Court concludes (as have most, if not all, courts addressing the issue), that the meaning of goods under § 503(b)(9) is primarily informed by the meaning of goods under Article 2 of the UCC. As the bankruptcy court in In re Goody's observed:
"Use of the UCC Article 2's definition of "goods" in interpreting section 503(b)(9) is suggested in a leading treatise and has been adopted by bankruptcy courts examining this issue. Given the near unanimous nationwide adoption of Article 2 of the UCC, the Court concludes that the term "goods" in section 503(b)(9) conforms with the meaning given in U.C.C. § 2-105(1) . . . ."
401 B.R. at 134.[21]
This approach also fosters uniformity. As noted above, each of the states, with the exception of one, has adopted the Article 2 definition of goods. And because the UCC definition has permeated our legal conception of goods, it also "is the definition on which sellers have come to rely in their transactions and is the `well-known' meaning." Circuit City, 416 B.R. *366 at 535-37.[22] Thus, this Court joins the majority of others and concludes that the appropriate meaning of goods under § 503(b)(9) corresponds with the meaning given to that term in § 2-105(1) of the UCC.[23] Nevertheless, out of an abundance of caution, this Court will also address the definition of goods which the Debtor urges be employed.

C. Whether Electricity is a Good under § 503(b)(9) of the Bankruptcy Code

1. What is Electricity?

. . . a form of energy occurring in two modes (positive and negative) as an intrinsic property of electrons and certain other subatomic particles, and produced as a flowing current when a conductor such as a copper wire is moved through a magnetic field.

 The Oxford English Dictionary[24]
It is important to realize that in physics today, we have no knowledge of what energy is. We do not have a picture that energy comes in little blobs of a definite amount. It is not that way.
 Richard P. Feynman[25]
. . . I give the experimentalist's answer to the very fundamental but very familiar query: "What is electricity?" His answer is naive, but simple and definite. He admits at once that as to the ultimate nature of electricity he knows nothing.

 Robert A. Millikan[26]
In some ways, the issue before the Court requires the impossiblethe explication of electrical energy, when even great physicists tell us its essential nature remains unknown.[27] Luckily, although the *367 precise nature of energy continues to elude us, the basic processes of electrical energy generation and its mechanics have been discovered. See, e.g., San Diego Gas & Elec. Co. v. The Super. Ct. of Orange Co., 13 Cal.4th 893, 55 Cal.Rptr.2d 724, 920 P.2d 669, 673-74 (1996) (quoting U.S. Cong., Office of Technology Assessment, Biological Effects of Power Frequency Electric and Magnetic Fields 4 (1989)). The following rudimentary and decidedly un-nuanced description of electricity that follows may cause the more scientifically-oriented to cringe, but it is, insofar as the Court has determined, an accurate summary.
We begin with the most basic concept, the idea that "all things are made of atomslittle particles that move around in perpetual motion." Feynman, Six Easy Pieces, at 4. These atoms, in turn, are comprised of "a nucleus that has a positive electrical charge . . . together with a number of electrons, all having the same negative charge and mass, which move at distances from the nucleus."[28] Electrons moving around the nucleus on the outermost plane (or "shell") can be knocked out of orbit and move from one atom to another, taking their charge with them. It is the energy produced by this movement of electrons from atom to atom that we call "electricity."[29]
Power plants use these basic principles to create electricity by applying a force to push electrons out of their orbits and cause them to "flow" from atom to atom. For example, the force of a spinning electromagnetic rotor will move electrons out of orbit in a nearby copper wire. This creates the electricity and electrical currents that move through various transmission and distribution lines and are ultimately diverted to homes and business where the electricity is put to use.[30]
How this electric current is then quantified was explained by the California Supreme Court in San Diego Gas & Electric:
An electric current is a group of charges moving in the same direction through a wire or other conductor. Voltage is the difference in electric potential that causes the charges to flow through the wire . . . and is measured in volts (V) or, in the case of power lines, in thousands of volts or kilovolts (kV). Current is the rate at which the charges flow through the wire . . . and is measured in amperes. The quantity of power (in watts) that a conducting wire transmits is thus the product of its voltage and its current. Power systems are designed to hold the voltage relatively constant but to meet fluctuating demand by allowing the current to rise and fall.
55 Cal.Rptr.2d 724, 920 P.2d at 673-74.[31]

2. Is Electricity "Tangible"?

Because the Debtor relies primarily on its articulation of the "common understanding" *368 of goods to include only tangible personal property, much of its analysis focuses on the assertion that electricity is not tangible, and is therefore not a good. According to the Debtor, electricity is "simply the movement of electrical charges" and the "physical phenomena arising from the behavior of electrons and protons," but does not have actual physical form or physical attributes.[32]
The court in Pilgrim's Pride, 421 B.R. at 239, articulated a similar analysis, beginning with the proposition that the "UCC § 2-105 does not suggest that the provision's drafters had intended that `goods' would include things which cannot be packaged and handled . . . things that, like manufactured goods, clearly occupy space and can be moved about . . . ." Id.[33] The court further concluded that electricity could be analogized to television, radio, telephone, and internet signals which are not considered goods under the UCC. Therefore, that court concluded, electricity should also be excluded from the category of goods under the UCC and § 503(b)(9).
But this Court discerns a marked difference between electricity and television, radio, telephone, and internet signals ("telecommunication signals"). Although their manifestations may appear similar, they are differentiated by both their physical attributes and the purposes for which they are purchased. Telecommunication signals are properly considered services because they are mechanisms by which other non-goodsintellectual property, ideas, sounds, music, images, and wordsare sent from one location to another. Electricity, in contrast, is not merely a medium of delivery, but is the thing the customer seeks to purchase. Customers paying for telecommunication signals may, on the whole, be fairly unconcerned with the physical properties or mechanics of the telecommunications signals, except to the extent that those physical properties enhance the delivery of information. On the other hand, electricity customers are undoubtedly concerned with the intimate physical properties of electricity. That is, customers rely on the specific physical properties of electricity to fulfill their needsanything deviating from those properties simply will not do. And it is those physical properties, the very nature of electricity, that customers contract to purchase.[34]
*369 The Court agrees with NewEnergy that, although its ultimate nature may be mystifying to most, electricity is tangible and does possess physical properties. It is not simply an "idea" akin to intellectual property. Although perhaps lacking in corporeal shape and not easily observed, electricity really is some thing, something that can be felt (although we are loathe to) and something that can be created, measured and stored.

3. Is Electricity a Good under § 2-105(1) of the UCC?

Section 2-105(1) of the UCC defines goods as:
all things . . . which are movable at the time of identification to the contract for sale . . .
U.C.C. § 2-105(1).

a. Movability and Identifiability

Electricity easily meets the movability requirement.[35] Neither the Debtor nor, insofar as the Court has determined, any court, has quarreled with the conclusion that electricity is literally movable.[36] After it is generated, the electric current moves through a huge network of transmission and distribution systems before ultimately reaching the customer's location.
*370 Like movability, the identifiability of electricity is subject to little debate. "Identification of goods occurs when existing goods are designated, or agreed upon, as the goods to which the contract refers." 2 Anderson U.C.C. § 2-501:4, at 734 (3d ed.2004). Courts have generally held that electricity is identifiable because it can be measured at the point it passes through the meter, see, e.g., Pacific Gas, 271 B.R. at 640 ("the amounts [of electricity] are metered and therefore identifiable"), and this Court agrees.

b. Movability at the Time of Identification to the Contract

While there is much agreement that electricity is both movable and identifiable, courts have reached different conclusions regarding whether electricity is movable at the time it is identified to the contract for sale.[37] The Debtor argues that electricity is no longer movable at the time it is identified to the contract (i.e., measured by the meter) because identification and consumption occur simultaneously.
But the conclusion urged by the Debtor rests upon an assumption with which the Court disagrees. The notion that electricity is consumed at the time it is identified by the meter (and is therefore no longer movable) is inconsistent with the fact that electricity does not simply reach a customer's meter and simultaneously cease to exist. Instead, it passes through the meter. At the time the electricity is identified to the contract, it is literally moving, and it remains movable for some period of time thereafter. The electricity continues to move through the customer's electrical wiring until it is ultimately put to use. This process may occur at speeds so imperceptible that consumption appears to occur simultaneous with identification, but logic compels the conclusion that the electricity is moving (and remains in motion) until it reaches the product sought to be electrified. Because the Court concludes that electricity is movable at the time it is identified to the contract, electricity constitutes a good within the meaning of the UCC and § 503(b)(9).[38]

*371 4. Applicability of the "Predominant Factor Test"

Faced with the possibility that the Court might view electricity as part-good, part-service, the Debtor argues that the Court should then also adopt the "predominant factor test" to determine whether the transaction was primarily for the sale of goods or provision of services. According to the Debtor, claims arising from transactions primarily relating to the provision of services would, under this test, be excluded from the priority status granted by § 503(b)(9). The Court disagrees, for the same reasons other courts have employed to reject the application of that test to § 503(b)(9).
The predominant factor test[39] is used by courts to determine whether the UCC Article 2 applies to a particular transaction. For transactions involving both the provision of services and the sale of goods, predominantly service-related transactions are not covered by the provisions of Article 2. See, e.g., White v. Peabody Constr. Co., 386 Mass. 121, 434 N.E.2d 1015, 1021 (1982) ("Contracts whose predominant factor, thrust, or purpose is the rendition of services are not within the scope of art. 2."); Mattoon v. City of Pittsfield, 56 Mass.App.Ct. 124, 775 N.E.2d 770, 784 (2002) ("Where a contract is for both sales and services ... in order to determine whether art. 2 is applicable, the test is whether `the predominant factor, thrust, or purpose of the contract is... "the rendition of service, with goods incidentally involved."'") (quoting White, 434 N.E.2d at 1021).[40]
*372 At least one court has applied the predominant factor test under § 503(b)(9), limiting priority status to goods sold incident to transactions that were primarily for the sale of goods. See, Circuit City, 416 B.R. at 538. This Court, however, agrees with those courts which have concluded that the predominant factor test has no application to § 503(b)(9), because the language of that provision grants priority status for any claim arising from the "value of goods" sold to a debtor, regardless of whether the transaction as a whole could be characterized as primarily the provision of services. The Court adopts the explanation given by the court in In re Plastech:
If a particular transaction provides for both a sale of goods and a sale of services, and the value of each of them can be ascertained, why shouldn't the value of the goods be entitled to the § 503(b)(9) administrative expense priority and the value of the services be relegated to an unsecured non-priority claim? ... [T]his Court does not have to reach a determination as to whether the sales ... would be considered sales of goods for purposes of the Uniform Commercial Code, products liability law, or tax law, under a predominant purpose test. Under § 503(b)(9), that determination is irrelevant. The only relevant determination under § 503(b)(9) is the value of the "goods" that were delivered, irrespective of whether the contract also called for the delivery and sale of services. The predominant purpose test does not inform the Court as to whether a particular thing that has been sold is or is not "goods." Therefore, the predominant purpose test is unnecessary.
397 B.R. at 837; see also Pilgrim's Pride, 421 B.R. at 237 & n. 7.
Because, as noted earlier, the Court holds that the transactions between the Debtor and NewEnergy did not involve the rendering of services, it finds that the predominant factor test has no applicability here. But even were part of what was delivered to the customer a service, the predominant factor test would be irrelevant to the determination of the value of goods received by a debtor within the meaning of § 503(b)(9).

5. Relevance of Reclamation Provisions under § 546(c)

The Debtor posits an additional reason why electricity should not be considered a good under § 503(b)(9)namely, that the meaning of goods under § 503(b)(9) should be interpreted in relation to the reclamation provisions under § 546(c)[41] and properly includes only goods that are capable of being "stockpiled" by debtors and reclaimed by creditors. But the Court finds that the Debtor's *373 argument goes too far and disregards the plain language of § 503(b)(9). The reference in § 546(c)(2) to a reclaiming creditor's ability to assert a priority claim under § 503(b)(9) does not limit the right of other creditorsthose who sell goods not easily susceptible to reclamationto assert priority claims under § 503(b)(9). And the placement of both §§ 503(b)(9) and 546(c) in the "Reclamation" section of the enacting public law does not persuade the Court that Congress had the type of limiting intent the Debtor would ascribe; the sheer placement of sections of the public law cannot trump the plain language of the Bankruptcy Code. Therefore, the Court agrees with the court's analysis in In re Plastech, where the court explained that:
"[T]here is no basis to import a requirement that the goods be reclaimable, as argued by the Debtor. Congress added § 503(b)(9) to the Bankruptcy Code as part of § 1227 of BAPCPA, entitled `Reclamation.' Most of BAPCPA is devoted to amending § 546 of the Bankruptcy Code, which provides relief to sellers of goods who failed to give an effective notice for reclamation. The Debtor reads this scant legislative history as an indication that § 503(b)(9) is a reclamation concept, and suggests that goods must be reclaimable in order for a seller to have a § 503(b)(9) claim. However, there is nothing in § 503(b)(9) that requires a claimant to also be entitled to a reclamation right under § 546. Section 546 does not limit or control in any way the rights that claimant has under § 503(b)(9)."
Plastech, 397 B.R. at 838.[42]

6. Section 503(b)(9) and the "Narrow" Interpretation of Priority Statutes

Finally, the Debtor presents an "equitable" argument for the narrow construction of goods as used in § 503(b)(9). Because the Supreme Court has cautioned that priority statutes should be interpreted narrowly to advance the Bankruptcy Code's principle of equal distribution, the Debtor urges this Court to construe § 503(b)(9) as foreclosing priority status for claims arising from the sale of electricity. But this argument is premised on the Debtor's assumption that electricity does not easily fit within the meaning of goods under § 503(b)(9).
Recently, the Supreme Court rejected an "expanded interpretation" of § 507(a)(5), indicating that priority statutes under the Bankruptcy Code should be narrowly construed. Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co., 547 U.S. 651, 667-68, 126 S.Ct. 2105, 165 L.Ed.2d 110 (2006). In that case, however, the Court engaged in a lengthy discussion examining whether "an employer's liability to provide workers' compensation coverage fits the § 507(a)(5) category `contributions *374 to an employee benefit plan ... arising from services rendered.'" Id. at 668, 126 S.Ct. 2105. Explicating the typical characteristics of employee benefit plans, the Court found that worker's compensation coverage was not easily fitted into the common understanding of an "employee benefit plan ... arising from services rendered." Id. Because the Court found it "far from clear" that the claims arising from worker's compensation payments fell within the terms of the priority statute, it resolved the "doubt concerning the appropriate characterization ... in accord with the Bankruptcy Code's equal distribution aim." Id. at 668, 126 S.Ct. 2105.
But that lack of clarity is not present here. Having determined that the only question is whether electricity, as supplied by NewEnergy, is a good under § 503(b)(9), this Court concludes that, using either the UCC definition or the definition urged by the Debtor, electricity easily falls within the definition. The Court should not find an ambiguity where there is none or make policy decisions to limit the application of Bankruptcy Code provisions when the language of the statute is otherwise clear.[43]

IV. CONCLUSION

For all the foregoing reasons, the Court concludes (1) that NewEnergy's Claim is based on the sale of electricity and not the provision of services and (2) that electricity constitutes a good under § 503(b)(9). Therefore, the Debtor's Objection will be overruled. An order in conformity with this Memorandum of Decision will issue forthwith.

Appendix 1
*375 
*376 
*377 

Appendix 2
*378 
*379 
*380 
*381 
*382 
*383 
*384 
*385 
*386 
*387 
*388 
*389 
*390 
*391 
*392 
*393 
*394 
*395 
*396 
*397 
*398 
*399 
*400 
*401 
*402 
*403 
*404 
*405 
*406 
*407 
*408 
*409 
*410 
*411 
*412 
*413 
*414 
*415 
*416 
*417 
*418 
*419 
*420 
*421 
*422 
*423 
*424 
*425 
*426 
*427 
*428 
*429 
*430 
*431 
*432 
*433 
*434 
*435 
*436 
*437 
*438 
*439 
*440 
*441 
*442 
*443 
*444 
*445 
*446 
*447 
*448 
*449 
*450 
*451 
*452 
*453 
*454 
*455 
*456 
*457 
*458 
*459 
*460 
*461 
*462 
*463 
*464 
NOTES
[1] The "Bankruptcy Code" or the "Code." Except as noted later in this memorandum, all references to code sections and numbers are to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.
[2] Namely, Erving Paper Mills, Inc., ERSECO, Inc., and Erving Realty Corp. On April 22, 2009 and October 7, 2009, this Court entered orders approving the joint administration of all four debtors' Chapter 11 cases.
[3] The Debtor and NewEnergy have also filed supplemental briefs. For clarity, however, any additional statements or arguments contained therein will be subsumed by the Court's reference to the "Objection" or "Response."
[4] At an initial hearing on the Objection, held to establish briefing deadlines and a further hearing date, the parties indicated that they would not be seeking an evidentiary hearing in connection with the Objection and Response. Hr'g Tr. 4:2-6, October 8, 2009. But Debtor's counsel also reserved the right to request an evidentiary hearing if necessary in the event NewEnergy's forthcoming Response contained factual averments disputed by the Debtor. 10/8/09 Hr'g Tr. 14:20-15:6. In response, the Court specifically stated that if facts were disputed, then arrangements to create an evidentiary record would be made at the next-scheduled hearing. And, if the facts were not disputed, the matter would be taken under advisement. 10/8/09 Hr'g Tr. 15:17-24. Neither party has since indicated that any factual assertions are in dispute.
[5] The Agreement between Erving Paper Mills, Inc. and NewEnergy, executed in March 2008, was delivered to the Court but subsequently impounded. See, infra, n. 10.
[6] See Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109-8, 119 Stat. 23 (April 20, 2005).
[7] Section 503(b)(9) provides:

(b) After notice and a hearing, there shall be allowed, administrative expenses, . . . including
. . .
(9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.
11 U.S.C. § 503(b)(9).
[8] See, e.g., In re Pilgrim's Pride Corp., 421 B.R. 231, 238 (Bankr.N.D.Tex.2009); In re Circuit City Stores, Inc., 416 B.R. 531, 534 (Bankr. E.D.Va.2009); Goody's, 401 B.R. at 135; In re Deer, 2007 WL 6887241, *1 (Bankr. S.D.Miss. June 14, 2007)
[9] Much of the following information can be found in the "Description of the Restructured Electric Industry" on the website maintained by the Massachusetts Executive Office of Energy and Environmental Affairs, reproduced at Appendix 1 and available at . ("Mass EOEEA") (last visited April 7, 2010).
[10] Pursuant to an Order of this Court, the Agreement was filed under seal and is not available on the public docket. However, at the direction of the parties, the Court has reviewed the Agreement in reaching its decision on the issues presented here. The limited portions of the Agreement to which this memorandum refers are not those identified as proprietary or sensitive, and were in fact referred to at the hearing and in NewEnergy's Response.
[11] The following description was derived from W.M. Warwick, A Primer on Electric Utilities, Deregulation, and Restructuring of U.S. Electricity Markets Part 4.0 Transmission and Distribution (Version 2.0 2002) ("Restructuring Primer"), prepared by the Pacific Northwest National Laboratory for the United States Department of Energy, attached hereto as Appendix 2 and available at (last visited April 7, 2010).
[12] Transmission of energy over a large network is accomplished more efficiently by raising the voltage and using high-voltage transmission lines.
[13] The Court is not persuaded by the reasoning in Otte v. Dayton Power & Light Co., 37 Ohio St.3d 33, 523 N.E.2d 835 (1988) and the line cases from the state of New York relying on Otte, see, e.g., Bowen v. Niagara Mohawk Power Corp., 183 A.D.2d 293, 590 N.Y.S.2d 628 (N.Y.App.Div.1992), wherein the courts held that electricity is not a product for the purpose of imposing strict liability and, by extension, is not a good under the UCC. The basis for Otte's holding was the court's determination that electric utilities do not "manufacture" electricity, but merely allow customers to access the electric company's service. The court was persuaded by its impression that charges for electricity by the kilowatt hour represents a measurement of time. 523 N.E.2d at 839. It is this Court's understanding, however, that the kilowatt hour measurement incorporates both quantity and duration of use. An actual "kilowatt of demand" measures the amount of electricity used at a specific point in time, while the kilowatt hour integrates both the quantity of electricity and the duration. Although actual consumption of electricity can be measured, the use of the kilowatt hour enables electric companies to "integrate demand and duration." See Restructuring Primer, Glossary, at A.23-24, reproduced at Appendix 3 and available at (last visited April 7, 2010). Thus, the use of a time element in measuring electricity consumption does not lead the Court to conclude that customers are merely taking advantage of a service over a particular period of time. Rather, the customers, in this Court's view, are being charged for actual electricity consumption.
[14] See Black's Law Dictionary 1666 (a "utility provider" is "a company that performs an essential public service"); 11 U.S.C. § 366 (referring to "service" in connection with a "utility," for example, "a utility may [or may not] alter, refuse, or discontinue service"; "a debt owed by the debtor to such utility for service") (emphasis supplied).
[15] Even if the Court were to determine that NewEnergy is a utility, that characterization would not foreclose NewEnergy's claim under § 503(b)(9). See, e.g., Pilgrim's Pride, 421 B.R. at 241 (nothing in the Bankruptcy Code forecloses a utility under § 366 asserting a priority claim under § 503(b)(9)); In re Plastech Engineered Prods., Inc., 397 B.R. 828, 839 (Bankr.E.D.Mich.2008) (rights under § 503(b)(9) are not limited by § 366 or the availability of any other remedies under the Bankruptcy Code).
[16] The Agreement's introductory paragraph states that it is to "govern transactions for the purchase and sale of electricity and related services to be entered into between the Parties from time to time . . . . [other parts of the Agreement] shall set forth . . . terms for the purchase and sale of electricity . . . ." Further references are found, inter alia, in paragraphs 1 (NewEnergy "shall supply" and Customer "shall purchase" electricity); T2.6.(b) ("Customer is entering into this Agreement to purchase its electric energy", "electric energy purchased under this Agreement"); and T2.13. (Customer's "purchase of electricity") (emphasis supplied).
[17] For instance, paragraph 1 provides that certain portions of the Agreement could specify services to be provided. Other references to services are found, for example, in paragraphs T2.4. (referring to customer accounts served by New Energy, the provision of service, and providing service to the Customer); T2.12. (goods and services received); and PS2.1. (NewEnergy will begin service or commence service) (emphasis supplied).
[18] NewEnergy's intermittent reference to its services provided to the Debtor are no more dispositive on the legal question than, for instance, a company supplying bottled water referring to its business as a "water delivery service"legally, such a characterization would not change the fact that the company is actually selling bottled water.
[19] SEC v. Tambone, 597 F.3d 436 (1st Cir. 2010) (discussing the meaning of the word "make" as used in 17 C.F.R. § 240.10b-5(b)), (citing Smith v. United States, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993); Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 472, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); In re Hill, 562 F.3d 29, 32 (1st Cir.2009)).
[20] Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (quoting Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 739-40, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)); see also Dewsnup v. Timm, 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 59, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Circuit City, 416 B.R. at 535; In re Modern Metal Products Co., 2009 WL 2969762, *1 (Bankr. N.D. Ill. Sept. 16, 2009); Goody's, 401 B.R. at 134.
[21] See also Circuit City, 416 B.R. at 535-37; Modern Metal, 2009 WL 2969762, at *1; Plastech, 397 B.R. at 836; In re Samaritan Alliance, LLC, 2008 WL 2520107, at *3 (Bankr. E.D.Ky. June 20, 2008); Deer, 2007 WL 6887241, at *1-2; cf. SemCrude, 416 B.R. at 405 (other undefined terms in § 503(b)(9) should also be defined by reference to UCC Article 2).
[22] The Court further agrees that the UCC definition is "consistent with the ordinary, `non-legal' meaning of the word," and the adoption of the Debtor's proposed "alternative" definition would have no difference to the outcome in this case. See, e.g., Pilgrim's Pride, 421 B.R. at 236 n. 4; Goody's, 401 B.R. at 134.
[23] The Court remains mindful, however, that § 503(b)(9) is federal law. As such, the definition of goods is also matter of federal, and not state, interpretation. Although the Court has not identified any state laws which deviate from the definition of goods found in § 2-105, see Local Code Variations, Anderson U.C.C. § 2-105, at 95-100 (2009 ed.), the Court agrees with the court's conclusion in Pilgrim's Pride that "the appropriate definition of goods for the purpose of Code § 503(b)(9) is that found in the `model' UCC," 421 B.R. at 236-37, and not any particular permutation adopted by an individual state. Of course, decisions interpreting the meaning of goods under § 2-105 will provide bankruptcy courts with a wealth of persuasive and insightful guidance. But to the extent that differences arise from "local enactments of the UCC or the variances in its interpretation by the courts of the states," the Court agrees that federal bankruptcy courts should be reluctant to give those variances effect under federal law. Id.; cf. United States v. Hext, 444 F.2d 804, 807-810 (5th Cir.1971) (interpretation of federal statute involving secured transactions under the federal FHA loan program, while requiring a "uniform federal interpretation," is guided by relevant portions of the UCC, since the UCC Article 9 is "the principal fount of general commercial law governing secured transactions").
[24] OED Online (Oxford University Press, Mar. 2010), available at (last visited April 7, 2010).
[25] Richard P. Feynman, "Conservation of Energy", in Six Easy Pieces: essentials of physics explained by its most brilliant teacher 71-72 (Basic Books 1995).
[26] Robert A. Millikan, Nobel Lecture: The Electron and the Light-quant from the Experimental Point of View, at 55 (May 23, 1924), available at (last visited April 7, 2010).
[27] In some respects, this Court must admire the clarity of the following observation provided by humorist Dave Barry: "We believe that electricity exists, because the electric company keeps sending us bills for it ...."
[28] Niels Bohr, Nobel Lecture: The Structure of the Atom, at 8 (December 11, 1922), available at (last visited April 7, 2010).
[29] See U.S. Energy Information Administration, Electricity Explained, reproduced at Appendix 5 and available at (last visited April 7, 2010).
[30] The electromagnetic rotors used to create the electricity are driven in the first instance by methods such as burning fuel to produce steam or by using gas, nuclear fuel or wind.
[31] But see Otte, 523 N.E.2d at 839 (consumers "do not pay for individual electrically charged particles. Rather they pay for each kilowatt hour provided. Thus, consumers are charged for the length of time electricity flows through their systems.")
[32] The Court has identified two cases that directly refer to electricity as "intangible." In Elgin Airport Inn, Inc. v. Commonwealth Edison Co., the court referred to electricity as "intangible" without providing any explanation for that characterization, and ultimately concluded nonetheless that electricity is a "product" for purposes of strict products liability. 88 Ill.App.3d 477, 43 Ill.Dec. 620, 410 N.E.2d 620, 623 (1980). The second case is Pierce v. Pacific Gas & Electric Co., where the court cited the passage from Elgin in a footnote, see 166 Cal.App.3d at 81 n. 6, 212 Cal.Rptr. 283, but also determined that electricity should be considered a "product" for purposes of applying strict products liability laws.
[33] For a thoughtful article discussing the approach to these issues urged by the Debtor and taken, in part, by the court in Pilgrim's Pride, see Philip J. Hendel, Does electricity qualify for an administrative expense claim? Query: Can you buy a can of it at Costco?, 51 Bankr.Ct. Decisions 21, at 4-5 (July 28, 2009).
[34] Electricity has been widely held to be both "property" and a "product" (for purposes of applying strict products liability principles). Although not dispositive of the question whether electricity is also a good under the UCC, the Court's review of relevant cases and the discussions of electricity contained therein reaffirm the Court's conclusion that electricity is tangible property. See, e.g., Commonwealth v. Catalano, 74 Mass.App.Ct. 580, 908 N.E.2d 842, 845-46 (2009) (Relying on Supreme Court case declaring that electricity is property, and other state courts holding similarly, the court concluded that electricity is a "personal chattel" which may the subject of larceny, because it "may be stored and conveyed. . . and may be transmitted through wires. Quantity of consumption is measurable, and the value of the electricity allegedly stolen may be the subject of testimony and exhibits."); Exxon Mobil Corp. v. Ala. Dept. of Conservation & Nat. Res., 986 So.2d 1093, 1110-11(Ala.2007) (noting that, under Alabama law, electricity is considered a "manufactured product"); Monroe v. Savannah Electric & Power Co., 267 Ga. 26, 471 S.E.2d 854, 856 (1996) (electricity is a product within strict liability statute); Bryant v. Tri-County Elec. Membership Corp., 844 F.Supp. 347, 349 (W.D.Ky.1994) (electricity is a product under strict liability law); Houston Lighting & Power Co. v. Reynolds, 765 S.W.2d 784, (Tex. 1989) (holding that electricity is a "product" for purposes of strict liability and stating that "[e]lectricity is a commodity, which, like other goods, can be manufactured, transported and sold"); Schriner v. Pa. Power & Light Co., 348 Pa.Super. 177, 501 A.2d 1128, 1133 (Pa.Super.Ct.1985) (electricity is a product for strict liability purposes); Mancuso v. S. Cal. Edison Co., 232 Cal.App.3d 88, 100, 283 Cal.Rptr. 300 (Cal.App.Ct. 1991) (electricity is a product under strict liability law) (citing Pierce v. Pacific Gas & Elec. Co., 166 Cal.App.3d 68, 212 Cal.Rptr. 283 (1985)); Smith v. Home Light & Power Co., 734 P.2d 1051, 1054, 1055 (Colo.1987) (agreeing with other courts that electricity can be a product for strict liability purposes, but only after it passes through a customer's meter); Aversa v. Pub. Serv. Elec. & Gas Co., 186 N.J.Super. 130, 451 A.2d 976, 980 (N.J. Super.Ct.1982) (electricity is product under strict liability law); Elgin, 43 Ill.Dec. 620, 410 N.E.2d at 623-24 (electricity is a product under strict liability law); Ransome v. Wisc. Elec. Power Co., 87 Wis.2d 605, 275 N.W.2d 641, 643, 648 (Wisc.1979) ("electricity itself, in the contemplation of the ordinary user, is a consumable product"); Hedges v. Pub. Serv. Co. Of Ind., Inc., 396 N.E.2d 933 (Ind.Ct.App.1979) (electricity is a "product" for purposes of strict liability) (citing Petroski v. N. Ind. Pub. Serv. Co., 171 Ind.App. 14, 354 N.E.2d 736 (Ind.Ct. App.1976)); but see, Bowen, 183 A.D.2d at 297, 590 N.Y.S.2d 628(electricity is not a "product" for purposes of imposing strict liability); Otte, 523 N.E.2d at 839 (same).
[35] The movability requirement results in the exclusion of real estate from the definition of goods under the UCC. See, e.g., 2 Anderson U.C.C. § 2-105:36, at 140 (3d ed.2004) (movability requirement "confirms the conclusion that goods involve personal property to the exclusion of real estate"); see also U.C.C. § 2-105 cmt. 1 ("The definition of goods . . . is not intended to deal with things that are not fairly identifiable as movables before the contract is performed.").
[36] See, e.g., Puget Sound Energy, Inc. v. Pacific Gas & Elec. Co. (In re Pacific Gas & Elec. Co.) 271 B.R. 626, 640 (N.D.Ca.2002); Helvey, 278 N.E.2d at 610.
[37] Compare, e.g., Pacific Gas, 271 B.R. at 640 ("Simply put, electricity in this instance is a thing movable at the time of identification to the contract for sale."); with Pilgrim's Pride, 421 B.R. at 239 & n. 8 ("Once electricity has been `identified' by measurement at the meter, it has already been consumed by the end user." "It is difficult to imagine how electricity to be delivered could be identified at all before transmission to the customer").
[38] See also, Enron Power Mktg., Inc. v. Nev. Power Co. (In re Enron Corp.), 2004 WL 2290486, *2 (S.D.N.Y.2004) (holding that Utah courts would consider electricity to be a good under Article 2 of the UCC); Pacific Gas, 271 B.R. at 640; Grant v. Southwestern Elec. Power Co., 20 S.W.3d 764, 771 (Tex.App. 2000), rev'd on other grounds, 73 S.W.3d 211 (Tex.2002) (citing, quoting Houston Lighting & Power Co. v. Reynolds, 712 S.W.2d 761, 766 (Tex.App. 1986), rev'd on other grounds, 765 S.W.2d 784 (Tex. 1988)); Cincinnati Gas & Elec. Co. v. Goebel, 28 Ohio Misc.2d 4, 502 N.E.2d 713, 715 (Hamilton Co. Mun. Ct. Ohio 1986) (electricity passing through meter and into consumer home is a good under UCC); Helvey, 278 N.E.2d at 610.

To the extent the Debtor relies on cases holding that electricity is not a good under the UCC, the Court finds those cases unpersuasive or distinguishable in that (1) the court's holding rests on public policy reasons not applicable here, see, e.g., Southwestern Elec. Power Co. v. Grant, 73 S.W.3d 211, 218-19 (Texas 2002) (holding that UCC Article 2 does not apply to the sale of electricity because doing so "would impair the comprehensive statutory scheme regulating the sale of electricity to Texas consumers"); New Balance Athletic Shoe, Inc. v. Boston Edison Co., 1996 WL 406673 (Mass.Super.Ct.1996) (holding that electricity is not a good under UCC primarily because the court was "troubled by the sweeping implications that this analysis may have on public utilities" and leaving to the legislature the "decision to expose public utilities to liability for their `products'"); (2) the written opinion does not detail the reasons behind the court's conclusion, see, e.g., Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 163 F.3d 153, 155 (2d Cir. 1998) (noting that "the UCC does not apply to the sale of electricity which is a service under New York law") (citing Bowen, 183 A.D.2d at 296-98, 590 N.Y.S.2d 628); In re Samaritan Alliance, LLC, 2008 WL 2520107, at *4 (stating simply: "Having considered the arguments of the parties, the court concludes that while courts are divided on the general question of whether or not electricity is `goods,' the court agrees with the Debtor that section 503(b)(9) is not applicable here and that the electricity provided is more properly characterized as a `service.'"); or (3) the court was not deciding the issue presented in this case, see, e.g., Plastech, 397 B.R. at 839 (stating, in dicta, that "if the utility in question does not sell goods [], but instead is found to have sold services (e.g., electricity as in Samaritan Alliance, 2008 WL 2520107), then the seller of the services is not entitled to a § 503(b)(9) administrative expense priority.. . ."); The Singer Co. v. Baltimore Gas & Elec. Co., 79 Md.App. 461, 558 A.2d 419, 424 (Md.Ct.Spec.App.1989) (holding that electricity is not a good under the UCC when it remains in the utility company's distribution system, because in its "raw state" it is not the "refined product that the customer intends to buy").
[39] The predominant factor test is sometimes referred to as the "predominant purpose" or "predominant aspect" test, "but regardless of its caption, the test is essentially the same." Circuit City, 416 B.R. at 537 n. 9.
[40] The Debtor relies on Mattoon in urging the Court conclude that electricity cannot be a good, because the Mattoon court held that water, which is even easier to grasp as a physical, tangible object, is not a good. But this is not what the Mattoon court stated. Because it was being asked to apply Article 2 of the UCC to the sale of water by the local water utility, the court first had to determine if the provision of water was primarily the sale of a good or provision of a service in deciding whether Article 2 applied. The court concluded that the amount the city charged to provide water included not only charges for the amount of water supplied, but also the additional costs of storing, treating and distributing the water. Ultimately, the court held that the predominant purpose of the transaction was the provision of services and not the sale of goods. 775 N.E.2d at 784. Thus, the court did not determine that water was not a good (in fact, the court implied that the transaction did involve the sale of goods), but only that the transaction as a whole should be deemed a service and was not governed by the provisions of Article 2. Id.
[41] Section 546(c) provides that a Trustee's power to, inter alia, avoid liens or transfers under § 544(a), 545, 547 and 549, are:

(1) ... subject to the right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim the goods if the debtor has received such goods while insolvent, within 45 days before the date of the commencement of a case under this title, but such a seller may not reclaim such goods unless such seller demands in writing reclamation of such goods
(A) not later than 45 days after the date of receipt of such goods by the debtor; or
(B) not later than 20 days after the date of commencement of the case, if the 45-day period expires after the commencement of the case.
(2) If a seller of goods fails to provide notice in the manner described in paragraph (1), the seller still may assert the rights contained in section 503(b)(9).
11 U.S.C. § 546(c).
[42] But see, Circuit City, 416 B.R. at 536, 537 (stating that § 503(b)(9) "appears to have been adopted as an attempt by Congress to enhance certain types of reclamation claims raised by creditors in bankruptcy cases"); Southern Polymer, Inc. v. TI Acquisition, LLC (In re TI Acquisition, LLC), 410 B.R. 742, 745-46 (Bankr.N.D.Ga.2009) (stating that "[w]hile no legislative history exists, one can only surmise that these amendments [adding § 503(b)(9) and revising § 546(c)] reflect Congress' intent to better insure that ordinary course of business sellers of goods received by the debtor in the twenty days before the petition date gain priority in payment over most other creditors"); Deer, 2007 WL 6887241, at *2 (stating that "§ 503(b)(9) was adopted to `operate [] in conjunction with 11 U.S.C.A. § 546(c)(2) to provide administrative expense treatment to a creditor with reclamation rights even if the seller fails to make a demand'") (quoting, citing 3 Bankruptcy Desk Guide § 24:78.10 (Thompson/West 2007); William Houston Brown & Lawrence R. Ahern, III, 2005 Bankr.Reform Legis. with Analysis 2d § 7:1 (Thompson/West 2006)).
[43] See Lamie v. U.S. Trustee, 540 U.S. 526, 533, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004); Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); United States v. Lewis, 554 F.3d 208, 214 (1st Cir.2009).