GFI WISCONSIN, INC., f/k/a Grede Foundries, Inc., Appellant,

v.

REEDSBURG UTILITY COMMISSION and Wisconsin Electric Power Company, Appellees.

No. 10–cv–388–bbc.

United States District Court, W.D. Wisconsin.

Nov. 12, 2010.

Daryl L. Diesing, Whyte Hirschboeck Dudek SC, Milwaukee, WI, for GFI Wisconsin, Inc., formerly known as Grede Foundries, Inc.

Timothy F. Nixon, Katherine Stadler, Godfrey & Kahn SC, Madison, WI, for the City of Reedsburg Utility Commission and the Wisconsin Electric Power Company.

## OPINION and ORDER

BARBARA B. CRABB, District Judge.

Appellant GFI Wisconsin, Inc., formerly known as Grede Foundries, Inc., appeals an order of the bankruptcy court allowing appellees Reedsburg Utility Commission and Wisconsin Electric Power Company to claim administrative priority status under 11 U.S.C. § 503(b)(9) for the value of electricity they supplied to appellant during the 20 days before appellant filed for bankruptcy. Appellant contends that because electricity is not a "good" within the meaning of § 503(b)(9), the bankruptcy court should have disallowed the claim. In addition, appellant contends that even if electricity is a good for purposes of § 503(b)(9), the bankruptcy court erred by failing to apply the "predominant purpose" test and by allowing appellees to recover the value of services that were bundled with the electricity charges.

This court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a). The bankruptcy court entered an order on June 1, 2010, denying appellant's objection to appellees' § 503(b)(9) claims. This is a final order for purposes of § 158(a) because there is nothing more to do with respect to appellant's objection. *In re Smith*, 582 F.3d 767, 776 (7th Cir.2009) ("An order of the bankruptcy court may be considered final, and thus immediately appealable, when it definitively resolves a discrete dispute within the larger case."); *In re Ross–Tousey*, 549 F.3d 1148, 1152 (7th Cir.2008) ("[A]n adjudication by the bankruptcy court is definitive because it cannot be affected by the resolution of any other issue in the proceeding, and therefore no purpose would be served by post-poning the appeal to the proceeding's conclusion.") (internal quotations omitted).

I agree with the bankruptcy court that appellees may claim administrative priority for the electricity they provided appellant in the 20–day period before appellant filed its bankruptcy petition. Therefore, I will affirm the decision of the bankruptcy court denying appellant's objection to the claims.

The following summary of relevant facts and proceedings is drawn from the record of the proceedings before the bankruptcy court. (All citations in the background section are to the bankruptcy court's docket, *In re: Grede Foundries, Inc.*, 09–14337–rdm.)

## BACKGROUND

### A. *Facts before the Bankruptcy Court*

On June 30, 2009, appellant GFI Wisconsin, formerly known as Grede Foundries, Inc., filed a chapter 11 bankruptcy petition in this district. Appellant owned several properties in Wisconsin that received electricity from appellees Reedsburg Utility Commission and Wisconsin Electric Power Company over a time period that includes the 20 days before the petition date.

On September 25, 2009, appellees submitted claims seeking administrative priority status under § 503(b)(9) for the value of the electricity they provided appellant during the 20–day period. Appellant objected to the claims on several grounds, one of which was that electric services are not goods for purposes of § 503(b)(9). Appellees challenged appellant's objection and the parties agreed to submit the claims and objections to the bankruptcy court on stipulations of facts and briefs, forgoing an evidentiary hearing.

On March 29, 2010, appellant filed motions to disallow the claims, a brief in

support of the motions and facts to which the parties had stipulated. Among other things, they stipulated that

- The electricity supplied by [appellees] to [appellant] during the Twenty–Day Period was metered at [appellant's] premises as it was being drawn and consumed by [appellant]; and
- Given the regulatory requirement that [appellees] make a pro rata estimate of the charges incurred during the Twenty–Day Period, [appellant] does not object to the amount of the Twenty–Day Claim.

Dkt. # 1887 at ¶ ¶ 7, 15 # 1890 at ¶¶ 7, 13. In its brief, appellant argued that appellees' claims were for electrical services, not goods, because electricity is not movable and identifiable at the time of the contract of sale, as required under the definition of goods found in the Uniform Commercial Code, Wis. Stat. § 402.105(1)(c). Dkt. # 1892 at ¶ 4. Appellant also argued that § 503(b)(9) claims are limited to goods capable of being reclaimed by a creditor, and electricity cannot be reclaimed. *Id.* at 7.

In their responses, appellees also relied on the UCC definition of goods and argued that electricity is both movable and identifiable at the time it is metered and thus, satisfies the definition of goods under the UCC. Dkt. ## 1949, 1950. Appellees relied heavily on *In re Erving Industries, Inc.*, 432 B.R. 354 (Bankr.D.Mass. Apr.7, 2010), in which the bankruptcy court concluded that electricity is a good. Appellees cited specifically the following language in *Erving Industries:*

At the time the electricity is identified to the contract [by passing through the meter], it is literally moving, and it remains movable for some period of time thereafter. The electricity continues to move through the customer's electrical wiring until it is ultimately put to use. This process may occur at speeds so imperceptible that consumption appears to occur simultaneous with identification, but logic compels the conclusion that electricity is moving (and remains in motion) until it reaches the product sought to be electrified.

*Id.* at 370.

Appellant filed a reply brief, dkt. # 1956, attempting to distinguish *Erving Industries* and discredit its conclusion. First, significant differences between the Massachusetts and Wisconsin electricity markets made the case distinguishable. Second, as a matter of physics, electricity is not movable after it has been metered. Appellant submitted the affidavit of Kevin Vesperman, an engineer, to explain the nature of electricity. Dkt. # 1957. Vesperman described the nature of electricity as follows:

[N]o movement of electrons will occur until the customer's load is connected and a circuit is completed. When the load is connected, the electrons begin to flow and create electric energy, and simultaneously, the electric energy is 'consumed.' With no customer load, no electrons move and no electric current is measured. In addition, the movement of electricity (electric energy current) is virtually instantaneous from one end of the conductor to the other end ... Therefore, when it is consumed, it is simultaneously measured. Movement does not take place after measurement by the meter. The court's conclusion [in *Erving*] that electricity 'passes through' the meter and continues to the customer for use thereafter does not match the actual physics. Electric energy is not like natural gas or water where those materials physically pass through the meter and then to the consumptive use. ... The electric energy is not 'movable' after metering; it does not 'move' to some other final consumptive use after

metering. Instead, the consumptive use is simultaneous with the metering. *Id.* at ¶ 9.

Finally, appellant argued that even if electricity is a good, appellees' claims should be disallowed under the "predominant purpose" test, or alternatively, the utility companies should be required to amend their claims to remove all the costs of the electric services they bundled with their electric energy charges.

Appellees filed a motion to strike appellant's reply brief and Vesperman's affidavit, along with an alternative motion for leave to file a sur-reply and hold an evidentiary hearing, dkt. # 1963. Appellees contended that appellant had raised new factual disputes and legal issues in its reply brief, including the value of the claims and the physics of electric energy. Appellant opposed the motion to strike on the ground that the reply brief responded to facts introduced by appellees that were inconsistent with the facts to which the parties had stipulated. Dkt. # 1990.

### B. *Bankruptcy Court Decision*

In an order dated June 1, 2010, Bankruptcy Judge Martin denied appellant's objections and allowed appellees' § 503(9)(b) claims. Dkt. # 2001. First, he addressed appellant's reply brief, stating that it was "problematic in several ways:" "[I]t range[d] far afield from the arguments raised in the utilities' brief," it "arguably contravene[d] the parties' agreement to submit the matter on agreed facts" and it was "far from clear that [Vesperman] would qualify as an expert." Nevertheless, the court denied appellees' motion to strike, concluding that "even taking the affidavit at its face value, [appellant's] motion for disallowance fails." *Id.* at 2.

In determining whether electricity qualified as a good under § 503(b)(9), the court applied the UCC definition of "goods" found in UCC § 2–105 and found that the electricity at issue was movable when it

entered the meter and moved from the power source to the meter to appellant's facilities. Because the electricity was moving, even if the movement was so fast as to be "nonexistent," it qualified as a good. The court rejected appellant's argument that electricity cannot be a good because it cannot be reclaimed under § 546(c). The court did not address appellant's arguments regarding the predominant purpose test, the Wisconsin electricity market, the treatment of utility services under the Bankruptcy Code and Wisconsin law or the bundling of goods and services.

### OPINION

Section 503(b)(9) of the Bankruptcy Code provides administrative priority to recovery of "the value of goods received by the debtor within the 20 days before the commencement [of the bankruptcy case] in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). Although courts are divided on what constitutes *goods* under § 503(b)(9), the plain language of the statute does not allow creditor claims arising from the provision of *services* to a debtor. *Id.; In re Brown & Cole Stores LLC*, 375 B.R. 873, 878 (9th Cir. BAP 2007) ("By the plain terms of the statute, a vendor's right to assert an administrative claim is limited [in that] the vendor must have provided goods (not services)").

Appellant raises three issues for review: (1) whether the bankruptcy court erred in finding that the electricity provided by appellees was a good for purposes of § 503(b)(9); (2) whether, even if the electricity was a good for purposes of § 503(b)(9), the bankruptcy court erred by failing to apply the predominant purpose test; and (3) whether, even if the predominant purpose test did not require denial of the claims, the bankruptcy court erred by

allowing appellees to recover the value of the services bundled with the value of the electric energy billed to appellant.

As an initial matter, there is some question about the proper standard of review to be applied to the bankruptcy court's June 1, 2010 order. Appellant challenges the bankruptcy court's conclusion that electricity is a good. If this conclusion is a question of fact, it may be set aside only if it is "clearly erroneous." Fed. R. Bankr.P. 8013. However, if it is a question of law or the application of law to fact, then the review is *de novo*. *Kovacs v. United States*, 614 F.3d 666, 672 (7th Cir.2010).

 The questions whether electricity qualifies a good for purposes of § 503(b)(9), whether the predominant purpose test applies and whether appellees must "unbundle" their administrative claims are questions of law subject to *de novo* review. The question whether the electricity at issue was moving at the time it was metered is a question of fact subject to review for clear error. Plaintiff contends, however, that because the bankruptcy court adopted facts inconsistent with the parties' stipulations, relied on facts not contained in the record and disregarded relevant facts in the record, its findings of fact related to whether the electricity was moving should be reviewed *de novo*. However, plaintiff has cited no legal authority suggesting that facts found by the bankruptcy court would be subject to *de novo* review. Nonetheless, it would be clearly erroneous for the bankruptcy court to rely on facts with no support in the record.

### A. *Electricity as a "Good"*

 The first question to be answered is what qualifies as a "good" under § 503(b)(9). The Bankruptcy Code does not define goods and there is no controlling case law construing the term as it is used in this section of the Bankruptcy Code. (The provision was added to the Code in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act and has been analyzed by only a few bankruptcy courts.) Every bankruptcy court to consider the issue, including the court below, has applied the Uniform Commercial Code definition of goods, found in UCC § 2–105. The courts reason that using the UCC definition will support uniformity because forty-nine states have adopted some version of the UCC. In addition, the courts dismiss the idea that they should craft a new definition of goods because "where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense." *In re Circuit City Stores, Inc.*, 416 B.R. 531, 535 (Bankr. E.D.Va.2009) (quoting *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 59, 31 S.Ct. 502, 55 L.Ed. 619 (1911)); *see also In re Plastech Engineered Products, Inc.*, 397 B.R. 828, 837 (Bankr.E.D.Mich. 2008) (applying UCC definition of goods to § 503(b)(9)); *In re Deer*, 2007 WL 6887241, *2 (Bankr.S.D.Miss. June 14, 2007) (same); *see also* 4 Collier on Bankruptcy, ¶ 503.16[1], 503–79 (16th ed. 2009) ("Although 'goods' is not defined in the Code, bankruptcy courts have adopted the definition in Article 2 of the Uniform Commercial Code.").

It is possible that the meaning of goods for purposes of § 503(b)(9) of the Bankruptcy Code is different from the meaning of goods under the UCC because the laws have different purposes. Section 503(b)(9) is a priority provision, unique to federal law. Presumably, one of the reasons § 503(9)(b) was enacted was to prevent debtors from stockpiling "goods" in the days leading up to their bankruptcy filings. *In re Plastech Engineered Products, Inc.*, 394 B.R. 147, 151–52 (Bankr.E.D.Mich. 2008); *In re Samaritan Alliance, LLC,*

2008 WL 2520107, *3–4 (Bankr.E.D.Ky. June 20, 2008). The UCC uses the term "goods" to delineate the scope of all of Article 2 and to determine whether the UCC applies to a particular transaction. UCC § 2–102 ("[T]his Article applies to goods. . . .").

However, the bankruptcy court below and the parties in this case assume that the UCC definition applies. Absent a different definition in the Bankruptcy Code or controlling case law, I conclude that it is reasonable to apply the definition provided by the UCC, as courts often do when interpreting Bankruptcy Code provisions, *In re Peaslee*, 547 F.3d 177, 184 n. 13 (2d Cir.2008). The UCC has been accepted by nearly all of the states and governs the sale of goods. Thus, most participants in the marketplace would not be surprised that the definition of "goods" that applies to ordinary transactions governed by the UCC would govern the meaning of the term in bankruptcy.

The UCC defines "goods" as "all things . . . which are movable at the time of identification to a contract for sale." UCC § 2–105; *see also* Wis. Stat. § 402.105(1)(c). The term includes future goods, specially manufactured goods, the unborn young of animals, growing crops and other identified things attached to realty as described in § 2–107. The term does not include "information, the money in which the price is to be paid, investment securities under Article 8, the subject matter of foreign transactions, or choses in action." To constitute goods under § 503(b)(9) then, the thing at issue must be identifiable, movable, have value and be received by the debtor during the 20–day period preceding the petition date.

Having decided the proper test to apply, I turn to the next question, which is whether the electricity delivered by appellees to appellant during the 20 days before its chapter 11 petition qualifies as a "good." The parties agree that the electric energy that is the subject of their contract was "identified to the contract" at the time it was metered, but they dispute whether the electricity was "movable" at the time it was metered.

Courts have reached different conclusions on whether electricity is a good under the UCC or Bankruptcy Code. *Compare In re MBS Management Services, Inc.*, 430 B.R. 750, 753 (Bankr.E.D.La. 2010) (citing decision in *Erving Industries* for proposition that electricity is "commodity" under Bankruptcy Code), *Erving Industries*, 432 B.R. at 370 (electricity is "good" under UCC and § 503(b)(9)), *Enron Power Marketing, Inc. v. Nevada Power Co.*, 2004 WL 2290486, *2 (S.D.N.Y. Oct.12, 2004) (applying UCC Article 2 to sale of electricity), *In re Pacific Gas & Electric Co.*, 271 B.R. 626, 640 (N.D.Cal. 2002) (electricity is "good" under UCC), *Cincinnati Gas & Electric Co. v. Goebel*, 28 Ohio Misc.2d 4, 502 N.E.2d 713, 715 (1986) (electricity that has passed through utility-owned conduits, through meters and into homes of consumers is "good" as defined in UCC), with *In re Pilgrim's Pride Corp.*, 421 B.R. 231, 239 & n. 8 (Bankr. N.D.Tex.2009) (electricity not "good" under § 503(b)(9)), *Samaritan Alliance*, 2008 WL 2520107, at *4 (same), *United States v. Consolidated Edison Co. of New York, Inc.*, 590 F.Supp. 266, 269 (S.D.N.Y.1984) (UCC not applicable directly to contracts for sale of electricity because electricity not "good"), *and Buckeye Union Fire Ins. Co. v. Detroit Edison Co.*, 38 Mich.App. 325, 196 N.W.2d 316 (1972) (electricity not "good" as defined in UCC).

Appellant contends that the answer to whether electricity is a movable good requires analysis of the physical nature of electricity, as well as the provisions in the Bankruptcy Code addressing utility providers and reclamation rights. Turning

first to the physical nature of electricity, appellant contends that the bankruptcy court reached a clearly erroneous conclusion that electricity is movable at the time it was metered because the facts in the record establish, as a matter of physics, that electricity is not movable when it is metered because it is consumed at the same time it is metered.

The only facts in the record were those facts stipulated by the parties and those contained in Vesperman's affidavit. The parties stipulated in the bankruptcy court that the electricity supplied by appellees to appellant during the 20–day period was "metered at [appellant's] premises *as it was being drawn and consumed* by [appellant]." Dkt. # # 1887, 1890 (emphasis added). Vesperman asserted that the conclusion of the court in *Erving Industries* "does not match the reality of the physics of electric energy," because "[m]ovement does not take place after measurement by the meter." Dkt. # 1957, ¶ 9. Vesperman explained that "the movement of electricity (electric energy current) is virtually instantaneous from one end of the conductor to the other end. Therefore, when it is consumed, it is simultaneously measured." *Id.*

Appellant contends that the only finding that could reasonably be drawn from these facts is that electricity is not moving at the time it is metered and is therefore, nonmovable. In its order, however, the bankruptcy court found the following:

- "the electricity was movable when it entered the meter";
- the "meter was installed in the middle of the circuit";
- "electrons flow rapidly through the circuit from the power source to the load";
- "the movement [is] 'virtually instantaneous'";
- "electrons are moving from the power source to the meter to the load"; and

- even though electrical flow is "rapid[ ] and at a subatomic level," the movement is sufficient to satisfy the definition of goods in the UCC.

Arguably, some of the bankruptcy court's findings exceed the facts described in Vesperman's affidavit and the stipulations of the parties, neither of which identifies where on the circuit the meter is located or concedes that electricity flows from the power source to the meter to the load. However, it is clear that the bankruptcy court credited Vesperman's statement that "the movement of electricity (electric energy current) is virtually instantaneous from one end of the conductor to the other end." The bankruptcy court relied on this statement to conclude that although the movement of electricity may be rapid and subatomic and "so fast as to be nonexistent," an electric current is literally moving through the transmission network and continues to move until it is delivered to a customer *at the time* it is metered and consumed. The bankruptcy court found this movement sufficient for electricity to qualify as a movable good. In addition, the court noted that under the UCC, water and natural gas are considered movable goods, and "there is no principled distinction to be made between natural gas, water, or electricity." Dkt. # 2001, at 4–5; *see also* UCC § 2–107(1) ("A contract for the sale of minerals or the like (including oil and gas) . . . is a contract for the sale of goods within this Article . . . .").

■■■ I conclude that the bankruptcy court ruled correctly that electricity is a "good" within the meaning of § 503(b)(9) of the Code. Determining the physical nature of electricity is complex. It requires an understanding of the nature of electrons and a grasp of quantum physics and special relativity. For the purpose of determining administrative priority under

the Bankruptcy Code, the meaning of "goods" under the UCC should not depend on quantum physics, how fast electrons are moving at a particular time or even where a debtor's meter is located on an electrical circuit. Rather, determining whether a particular thing qualifies as a good and deserves administrative priority should be a straightforward assessment, taking into consideration the nature and common understanding of the thing, but also considering its similarities to goods that fall undisputedly under the UCC and would receive administrative priority under § 503(b)(9).

Initially, the parties in this case appeared to believe that the issue whether electricity is a good could be resolved with little, if any, analysis of facts regarding the physics of electricity and could be decided instead by reviewing 16 stipulated facts containing no details about the physics of electricity. As appellant admits, "the *only* evidence in the record on the issue whether electricity meets the U.C.C. definition for a good for purposes of § 503(b)(9)" is Vesperman's testimony, which was not submitted until *after* appellees cited the discussion in *Erving* regarding the physical nature of electricity. Appellant's Br., dkt. # 8, at 4. This shows that the parties did not anticipate that opinions of expert engineers or physicists would be needed to decide a question for bankruptcy purposes. Rightly so.

Few courts deciding how electricity should be treated under the UCC or other laws focus solely or even primarily on the physics of electricity; rather, they consider the general movability of electricity, common perceptions of electricity and the exchange of electricity as a commodity in the marketplace. For example, the bankruptcy court in *Erving Industries*, 432 B.R. at 370, stated that it is "logical" that electricity would be considered a good under the § 503(b)(9) because it is both identifiable and moving until it reaches the intended customer. Similarly, in *Pacific Gas*, 271 B.R. at 640, the court considered how electricity had been treated in other areas of the law and concluded that metering satisfies the identification requirement of the UCC and moving through a circuit satisfies the movability requirement. *Id.* ("Simply put, electricity in this instance is a thing movable at the time of identification to the contract for sale.")

Similarly, courts determining whether electricity is "property" or a "product" for purposes of product liability, theft or other purposes, focus on the general physical nature of electricity and its movability. *E.g., Commonwealth v. Catalano,* 74 Mass. App.Ct. 580, 908 N.E.2d 842, 845–46 (2009) (electricity is "personal chattel" that may be subject of larceny because it "may be stored and conveyed . . . may be transmitted through wires . . . [and the] [q]uantity of consumption is measurable"); *Monroe v. Savannah Electric & Power Co.,* 267 Ga. 26, 471 S.E.2d 854, 855–56 (1996) (electricity is product for strict liability purposes because it can be "produced, confined, controlled, transmitted, and distributed in the stream of commerce . . . [and] can be measured, bought and sold, changed in quantity or quality [and] delivered wherever desired") (internal citations and quotations omitted); *Bryant v. Tri–County Electric Membership Corp.,* 844 F.Supp. 347, 349 (W.D.Ky.1994) (electricity is product under strict liability law because it "can be made or produced . . . confined, controlled, transmitted and distributed").

I agree with those courts concluding that electricity is movable, tangible and consumable, that it has physical properties, that it is bought and sold in the marketplace and thus, that it qualifies as a good for purposes of the UCC and the Bankruptcy Code. As noted by the bankruptcy court below, electricity begins flowing through power lines when a circuit is

formed and continues moving at least until it is metered. The metering satisfies the identification requirement of the UCC and the movement is sufficient to satisfy the movability requirement, even if it reaches the speed of light. *Pacific Gas & Electric,* 271 B.R. at 640 (electricity is "good" because it can be moved through power lines and identified through meters); *see also Helvey v. Wabash County REMC,* 151 Ind. App. 176, 278 N.E.2d 608, 610 (1972) (analogizing electricity to natural gas and finding that electricity satisfies movability and identifiability requirements of UCC as it moves into meter).

I disagree with the court in *Pilgrim's Pride,* 421 B.R. at 234, which held that electricity is not similar enough to goods that fall under the UCC § 2–105, because such goods occupy space, can be packaged, handled and moved. The court held that electricity is similar to television, radio, telephone and internet signals that would not be considered goods under the UCC. However, electricity can be moved, as explained by appellant's expert and found by the bankruptcy court; it can be consumed, as stipulated by the parties; and there is no suggestion that electricity cannot be packaged and handled, such as in a battery. In addition, as the court noted in *Erving Industries,* electricity is different from telecommunication signals because it is not merely a medium of delivering something else; it is the "thing" the customer seeks to purchase. *Erving Industries,* 432 B.R. at 368. "[I]t is those physical properties, the very nature of electricity, that customers contract to purchase." *Id.*

█ The fact that the Bankruptcy Code addresses the post-petition rights and obligations of utility services providers in a separate section of the Code does not change my conclusion. Section 366, titled "Utility Service," provides for the continuation of "utility services" after a debtor has filed for bankruptcy. In the underlying bankruptcy case, appellees requested protection under § 366, representing themselves as utilities that provide *services.* Appellant argues that because § 366 consistently refers to "utility services," an interpretation of "goods" under § 503(b)(9) that includes utility services would be inconsistent with the use of the word "services" in § 366.

Just because a seller of goods may also be a utility that is entitled to the protection of § 366 for the sale of utility services post-petition to a debtor does not mean it is prohibited from allowance of a § 503(b)(9) administrative expense claim to the extent that it has sold goods to the debtor that qualify under § 503(b)(9). Section 503(b)(9) addresses the sale of goods pre-petition and § 366 addresses the provision of utility services postpetition. The sections are not mutually exclusive. A utility provider may provide both goods and services within the meaning of each section. In sum, the rights afforded by § 503(b)(9) to a seller of goods are not dependent either explicitly or implicitly upon the availability of other remedies under the Code for the seller. *In re Plastech,* 397 B.R. at 839 (concluding that natural gas is "good" recoverable under § 503(b)(9), regardless whether creditor was entitled to protections under § 366); *Pilgrim's Pride,* 421 B.R. at 241 (holding that nothing in § 366 forecloses gas providers from asserting priority claim under § 503(b)(9)).

In addition, in deciding whether appellees have a claim under § 503(b)(9), it is irrelevant whether Wisconsin's rules for electrical utilities requires utilities to furnish "adequate service" to their customers, Wis. Admin. Code § PSC 113.0201, or that appellees represent themselves as service providers to the public. That a company provides services does not bar it from sell-

ing goods that qualify for administrative priority under § 503(b)(9).

◼ Finally, the bankruptcy court was correct to reject appellant's argument that although the definition of "goods" is governed by the UCC, the term should be limited to goods that are reclaimable. Congress added § 503(b)(9) to the Bankruptcy Code as part of § 1227 of the Bankruptcy Abuse Prevention and Consumer Protection Act, entitled "Reclamation." Most of § 1227 is devoted to amending § 546 of the Code to provide relief to sellers of goods who failed to give an effective notice for reclamation. Appellant reads this as an indication that § 503(b)(9) is a reclamation concept and suggests that goods must be reclaimable in order for a seller to have a § 503(b)(9) claim. Appellant contends that once electricity has been metered, it is consumed by the customer and is no longer capable of being reclaimed.

The bankruptcy court rejected this argument, noting that § 546 does not require that goods *must* be reclaimable to fall under § 503(b)(9) and at any rate, electricity might well be reclaimable, as when it is stored in a battery. Dkt. # 2001, at 5. I agree. Nothing in the language of § 503(b)(9) requires a claimant to be entitled to a reclamation right under § 546. *Lamie v. United States Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (quotations and citations omitted). Had Congress intended to limit administrative priority claims under § 503(b)(9) to only the subset of goods that could qualify for reclamation under § 546(c), Congress could have said so. Although the sections were amended at the same time, they operate independently. Section 503(b)(9)

gives a creditor the opportunity to receive payment for goods delivered within the 20–day period before the bankruptcy filing, but it does not allow a creditor to claim a lien or otherwise repossess those delivered goods. In other words, it is not a reclamation claim. Other courts have reached the same conclusion. *Plastech,* 397 B.R. at 838; *see also Collier,* ¶ 546.04[3] ("Based on the construction and wording of sections 546(c)(2) and 503(b)(9), a seller's right to assert an administrative expense priority claim does not appear to be subject to the rights and claims of secured creditors, *nor does the seller need an independent right to reclamation.*") (emphasis added).

In sum, taking into consideration the physical properties of electricity as noted by appellant's expert and the bankruptcy court, including the fact that electricity is movable, and the parties' agreement under which the energy usage and consumption were determined by meter readings, I conclude that electricity is a good under the UCC definition and also under the Bankruptcy Code.

### B. *Predominant Purpose Test and the Bundling of Goods and Services*

◼ Appellant contends that even if electricity is a "good" for purposes of § 503(b)(9), the bankruptcy court erred by failing to apply the "predominant purpose" test to determine whether the contract between the parties was predominantly for goods or services. According to appellant, claims arising from transactions relating primarily to the provision of services should, under the predominant purpose test, be excluded from the priority status granted by § 503(b)(9) because appellees provided electric energy generation, transmission, distribution, metering, management and conservation program services, in addition to actual electric energy. The bankruptcy court did not address appel-

lant's predominant purpose argument. It is not clear whether the court deemed the argument waived because appellant raised it for the first time in its reply brief or concluded simply that the argument lacked merit.

The predominant purpose test applies where a transaction involves a mixture of goods and services and there is a need to categorize the transaction as either a sale of goods or not. *Ogden Martin Systems of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 530 (7th Cir.1999). Most often, the predominant purpose test is used by courts to determine whether Article 2 of the UCC applies to a particular transaction. *Id.* For transactions involving both the provision of services and the sale of goods, predominantly service-related transactions are not covered by the provisions of Article 2.

At least one bankruptcy court has applied the predominant purpose test in the § 503(b)(9) setting, concluding that priority status applies only to goods sold incident to transactions that were primarily for the sale of goods. *In re Circuit City Stores, Inc.*, 416 B.R. 531, 537–38 (Bankr. E.D.Va.2009). However, I agree with the bankruptcy courts that have rejected the application of the predominant purpose test to § 503(b)(9) priority status, concluding that nothing in § 503(b)(9) requires that approach. *E.g., Erving Industries*, 432 B.R. at 372; *In re Plastech*, 397 B.R. at 837.

As the court explained in *Plastech*:

If a particular transaction provides for both a sale of goods and a sale of services, and the value of each of them can be ascertained, why should the value of the goods not be entitled to the § 503(b)(9) administrative expense priority and the value of the services be relegated to an unsecured non-priority claim? In drawing that line, the court does not have to reach a determination whether contracts would be considered sales of goods for purposes of the Uniform Commercial Code, products liability law or tax law, under a predominant purpose test. Under § 503(b)(9), that determination is irrelevant. The only relevant determination is the value of the "goods" that were delivered, irrespective of whether the contract also called for the delivery and sale of services. The predominant purpose test does not inform the court whether a particular thing has been sold is or is not "goods." Therefore, the predominant purpose test is unnecessary.

*In re Plastech*, 397 B.R. at 837–38. The contract at issue in *Plastech* involved the provision of services (clearing snow) and goods (salt and chloride de-icer). The court held that the value of the goods qualified for administrative priority status under § 503(b)(9), while the value of the services did not. *Id.* at 839. I find this approach persuasive and conclude that the predominant purpose test has no place in § 503(b)(9). Nothing in that statute calls for disqualifying a § 503(b)(9) claim just because the contract under which the eligible goods were sold also provides for the sale of services.

This conclusion leads directly into appellants' final argument, which is that even if electricity is movable after metering, and the predominant purpose does not apply, appellees should not receive administrative priority for the full amount of the bills to appellant during the 20–day period because the electricity itself it is a relatively small portion of the utilities' bill when compared to the transmission, substation, distribution, metering and other customer service components bundled in the utilities' charges. Also, even the electricity cost component is not just for the energy generated. It includes a capacity charge, meaning that the customer is charged the

equivalent of a reservation fee for the right to draw energy generation from the utility. This charge is bundled with the energy usage charge to create an electricity service cost. In other words, appellant argues that appellees should be required to file amended proofs of claim that reduce their claims solely to the amounts they charged the debtor for the electric energy component of their bills, just as the creditors in *In re Plastech* could recover only for the actual goods they supplied.

Appellant made this argument regarding the bundling of services for the first time in its reply brief and the bankruptcy court did not address the argument in its order. The bankruptcy court criticized appellant's reply brief because it "rang[ed] far afield from the arguments raised in the utilities' brief" and because it "arguably contravene[d] the parties' agreement to submit the matter on agreed facts." Dkt. # 2001, at 2. Although the bankruptcy court declined to strike the entirety of appellant's reply brief, it did not respond to several of the arguments appellant raised for the first time in its reply brief, suggesting that it deemed those issues to be waived.

Appellant contends that it did not waive the argument because it was merely a response to appellees' reliance on the court's decision in *Erving Industries*. In that case, the court was considering an unbundled claim for electric energy. The problem with this argument is that appellees' response brief referred only to the discussion in *Erving Industries* regarding the nature of electricity, and did not mention anything about the significance of a bundled or unbundled claim. This makes sense, because the only issue before the court was whether electricity is a good. Appellant did not raise the issues whether a contract for both goods and services can gain priority status or whether contracts for goods and services must be unbundled for purposes of § 503(b)(9).

In contrast, in *Erving Industries* the debtor had raised several issues before the court, one of which was that the contract at issue was for services or at most, part-good, part-service. *Erving Industries,* 432 B.R. at 371. If in this case, appellant had wished to object to the claim on the ground that appellees provided several "services" in addition to the actual electricity, it could have raised that point in its initial brief. However, appellant never raised a bundling objection to the claims or otherwise put appellees on notice that it disputed the value of the claims. In fact, before it filed its reply brief, appellant admitted that it did not dispute the value of the claims, but rather objected on the ground that electricity is not a good. *E.g.,* dkt. # 1892 ("the Debtor does not dispute the value of [appellees'] claims"); dkt. # 1887 ("the Debtor does not object to the amount of [appellees'] Twenty–Day Claim"); dkt. # 1886 ("The grounds for this motion [to disallow appellees' claims] are that [appellees] supplied electrical services, which are not goods for purposes of 11 U.S.C. § 503(b)(9)"); dkt. # 1887 ("the Parties agreed to forgo an evidentiary hearing on the Twenty–Day Claim and instead to submit briefs on the decisive issue of whether electricity is a good under § 503(b)(9)").

In sum, it was appropriate for the bankruptcy court to disregard this argument, issue a decision on the question presented for consideration and hold that electricity is a good.

## ORDER

IT IS ORDERED that the decision of the United States Bankruptcy Court for the Western District of Wisconsin denying appellant GFI Wisconsin Inc.'s objection to the 11 U.S.C. § 503(b)(9) claim filed by appellees Wisconsin Electric Power Com-

pany and Reedsburg Utility Commission is AFFIRMED.